# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

DAVID E. GEARHART,

        Plaintiff,   :    Case No. 2:17cv856

- vs -    Judge Sarah D. Morrison
    Magistrate Judge Chelsey M. Vascura

E.I. DU PONT DE NEMOURS AND CO.,
    :
        Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 26.) Plaintiff David E. Gearhart has filed a Response in Opposition (ECF No. 32), and Defendant has filed a Reply Brief (ECF No. 35). The matter is now ripe for a decision.

**I.    Statement of the Facts**

Plaintiff David E. Gearhart worked for Defendant E.I. DuPont de Nemours and Co. ("DuPont") at its Circleville, Ohio, plant beginning on October 2, 2012, as a Kapton Casting Operator. (Gearhart Dep. 26, 28-30, ECF No. 22-1). According to the Complaint, Mr. Gearhart suffers from Sarcoidosis, cardiovascular disease and chronic spine issues and these medical conditions substantially limit one or more of his major life activities of walking, breathing, lifting, and bending. (Compl. ¶ 4, ECF No. 1) However, during his deposition, Mr. Gearhart denied being limited in his activities other than for the months of September through December 2016. (Gearhart Dep. 195-96, 203-04.)

In his position as an Operator, Mr. Gearhart's duties included going into the ovens at the plant and cleaning them. (*Id.* at 36-39, Ex. 3, pp. 2-3, Ex. 4.) At the time of entry and cleaning of the ovens, the temperatures were usually elevated – temperatures of approximately 140 to 150

degrees Fahrenheit. (*Id.*) As a result, Operators are required to wear multiple forms of personal protective equipment, including fire-retardant Kevlar suits, protective hoods, respirators and other items that collectively weigh thirty to thirty-five pounds. (*Id.*) While wearing all of that equipment, Operators must get on their hands and knees, get up and down frequently, and must work slowly to avoid heat exhaustion. (*Id.* at 42). In addition to these physical demands, Kapton Casting employees are actively moving in and out of the oven throughout their twelve-hour shifts; some shifts the oven work could be for only thirty minutes, while for other shifts an Operator could be moving in and out of the oven for the entire shift. (*Id.* at 38, 41-43). The nature of this work led to DuPont's requirement that employees must have medical clearance from DuPont's plant doctor to work in the Operator position. (*Id.* Ex. 3 p. 2, Ex. 4; Mike Dutton Dep. 52, 64-65, ECF No. 24-1.) Dr. Brent Cale was DuPont's plant doctor during the relevant time period. (Dutton Dep. 65.)

Mr. Gearhart had a triple bypass surgery on May 7, 2014, after suffering a heart attack. (Gearhart Dep. 70-75.) Following that surgery, he was on medical leave until mid-September 2014. (*Id.* at 75-76) Upon his return, Mr. Gearhart was on light duty and an hours restriction for approximately four weeks. (*Id.* at 76-77). On October 21, 2014, Mr. Gearhart gave Dr. Cale a note from his personal cardiologist (Dr. Britton Young) releasing Mr. Gearhart to return to work. (Brent Cale Dep. 58-59, ECF No. 23-1; Gearhart Dep. Ex. 7, page ID # 261.)

Because the note from Dr. Young did not mention Mr. Gearhart working in the hot oven, Dr. Cale refused to approve Mr. Gearhart for oven work until he got another note from Dr. Young specifically stating that Mr. Gearhart could safely work in the oven. (Cale Dep. 61-69). Dr. Cale testified that given Mr. Gearhart's history, he was not comfortable releasing Mr. Gearhart for oven work without express approval from his cardiologist. (*Id.*) That express

2

approval came on November 11, 2014, when Mr. Gearhart gave Dr. Cale a note from Dr. Young stating that he was releasing Mr. Gearhart to full duty, including oven entry. (*Id.* at 65-66). Once he received that note, Dr. Cale released Mr. Gearhart to return to work without restrictions. (*Id.*)

In July 2016, Mr. Gearhart was admitted to the hospital due to medication issues related to his cardiovascular condition. (Compl. ¶ 11; Gearhart Dep. 90.) At the time, his blood pressure was elevated, he was having chest pains, and he was having difficulty pushing things and standing for a long time. (Gearhart Dep. 92-93.) After this hospital admission, Mr. Gearhart was off work for five days pursuant to the instructions of his primary care doctor, Dr. Jaya Thakur. (*Id.* at 94, 100-101, Ex. 18, p. 3.) When Dr. Thakur released Mr. Gearhart to work on July 19, 2016, that release stated that Mr. Gearhart could only perform "regular office work." (*Id.* at 100-02.) That situation did not last long because, later in August, Plaintiff had surgery for a different medical condition (umbilical hernia) and was subsequently off work for six more weeks. (*Id.* at 105-106.)

Following his hernia surgery, when Mr. Gearhart sought to return to work on or about August 23, 2016, he met with Dr. Cale. (*Id.* at 107-08.) During that meeting, he and Dr. Cale talked about Mr. Gearhart's oven work at the plant, though there is a dispute regarding exactly what Mr. Gearhart said to Dr. Cale. Dr. Cale's notes of that meeting reflect that Mr. Gearhart said: "his cardiologist is not comfortable with him working in the oven due to his cardiac disease. Patient's cardiologist did not put this in writing, because patient specifically told him not to put it in writing." (Cale Dep. 181.) However, Mr. Gearhart claims that his "exact words" to Dr. Cale were "[my cardiologist] doesn't think anybody ought to go into an oven." (Gearhart Dep. 108.)

Prior to this meeting with Dr. Cale, according to his plant medical chart, Mr. Gearhart had told a DuPont nurse that his cardiologist told him that he could "never go in the oven again"; however, Mr. Gearhart denies saying that to a nurse. (*Compare* Gearhart Dep. 106-07, *with* Ex. 7, ECF No. 22-5, page ID # 247). Nevertheless, during his deposition in this case, Mr. Gearhart acknowledged that his cardiologist "was uncomfortable with me working in a high temperature oven." (Gearhart Dep. Ex. 110.)

In fact, following an appointment on August 11, 2016, Mr. Gearhart's new cardiologist (Dr. Douglas Magorien) advised Dr. Thakur in writing that, "[d]ue to [Mr. Gearhart's] cardiac history he should not work in an oven with high temperatures." (Cale Dep. 194-97, Ex. 4, p. 3). Dr. Cale was not aware that Mr. Gearhart had a new cardiologist at that time, nor was he aware of this letter. (*Id.* at 195)

When Mr. Gearhart returned to work in August 2016, Dr. Cale was concerned with Mr. Gearhart's safety if he was going to work in the oven. (*Id.* at 193-94.) This is because, as Dr. Cale described it, oven work is "[p]hysically strenuous activity, high temperatures, which is physically stressful on the cardiovascular system. . . . [In addition,] the multi layers of [protective equipment] that are worn and just the heaviness of the equipment, that there would be crawling involved, kneeling involved, reaching and pulling involved inside a pretty confined, tight space…" (*Id.* at 129.) Accordingly, and with knowledge of Mr. Gearhart's history of cardiac disease and surgery, on August 23, 2016, Dr. Cale permanently restricted Mr. Gearhart from working the oven at DuPont. (Gearhart Dep. 111-12, 117; Cale Dep. 104-09, 181-82, 189.)

So Mr. Gearhart was permitted to return to work but with Dr. Cale's restriction on working in the ovens. Because of Dr. Cale's restriction prohibiting Mr. Gearhart from working in the ovens, DuPont temporarily assigned him to a position that did not require entry into a hot

oven. (Gearhart Dep. 160-61.) It then engaged in an interactive accommodation process with Mr. Gearhart to explore ways that it could accommodate the limitation placed on him by Dr. Cale. (*Id.* at 153.)

DuPont management conducted a series of "accommodation hearings" with Mr. Gearhart between September and December 2016 in an effort to accommodate his medical restrictions and allow him to keep working. (*Id.* at 153-54, Ex. 32, ECF No. 22-12.) DuPont's accommodation review process requires managers, human resources, and the restricted employee to work together to find an effective accommodation. (Dutton Dep. 61-62, Ex. 6.) As part of this process, DuPont encouraged Mr. Gearhart to apply for any positions that opened up within the plant. (Gearhart Dep. 63-64.) Also, DuPont identified three potential accommodations for Mr. Gearhart: (1) progress Mr. Gearhart to a level 4 Chemical/Solvent Recovery Operator position (*Id.* at 155-57, 167-68); (2) assign him to a role in which he dumped monomers (*Id.* at 158-61); or (3) transfer him to the Tedlar area of the plant (*Id.* at 162-66). For various reasons, however, none of these accommodations were made.

By December 2016, DuPont's management had concluded that none of the accommodations considered during the interactive process would work to allow Mr. Gearhart to work at the plant with Dr. Cale's medical restriction of no oven work. (*Id.* Ex. 32, at 4–5.) Around that same time, Mr. Gearhart began to experience additional health issues and was off work for thirty days due to two back surgeries. (*Id.* at 124-35.)

In January 2017, Mr. Gearhart applied for long term disability ("LTD") benefits; he says he applied only because DuPont's human resources manager, Mike Dutton, made him do it. (*Id.* at 135-39.) Nevertheless, the application was granted, and Mr. Gearhart began to receive long-

term disability benefits. (*Id.* at 27-28, 137-38.) DuPont terminated Mr. Gearhart's employment effective February 8, 2017. (*Id.* at 26-27.)

In fact, Mr. Gearhart was on LTD for only a short period of time. After approximately five months, he ended the LTD benefits when he went to work for New England Motor Freight. (Gearhart 140).

Mr. Gearhart filed the Complaint in this action on September 29, 2017. In his Complaint, he alleges the following claims: Americans with Disabilities Act (ADA) failure to accommodate (Count 1), ADA disparate treatment (Count 2), ADA perception of disability, which the Court interprets as a disability discrimination claim (Count 3), Ohio state law failure to accommodate (Count 4), Ohio state law disparate treatment (Count 5), Ohio state law perception of disability (Count 6), and Age Discrimination in Employment Act (ADEA) disparate treatment (Count 7).

**II.     Standard for Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

**III. Analysis**

**A. ADEA Claim**

The Court begins its analysis with Mr. Gearhart's Count 7, which alleges a violation of the Age Discrimination in Employment Act ("ADEA").

DuPont's Motion for Summary Judgment addressed all of Mr. Gearhart's claims, including his ADEA claim. However, Mr. Gearhart's Response in Opposition to that Motion never discusses or mentions his ADEA claim. In response to DuPont's arguments seeking judgment on his ADEA claim, Mr. Gearhart was obligated to identify specific evidence supporting his claim. He failed to do so by failing to address the claim at all. The Court thus finds that Mr. Gearhart has abandoned this claim and declines to consider the merits. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

DuPont's Motion for Summary Judgment as to Count 7 is **GRANTED**.

### B. Americans with Disabilities Act and State Law Claims

The ADA prohibits discrimination by an employer "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2018). Similarly, the Ohio Civil Rights Act, which was modeled on the ADA, provides:

> It shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code Ann. § 4112.02(A) (West 2019); *Pflanz v. City of Cincinnati*, 778 N.E.2d 1073, 1080 (Ohio Ct. App. 2002); *see City of Columbus Civil Serv. Comm'n. v. McGlone,* 697 N.E.2d 204, 206-07 (Ohio 1998).

The ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA"), defines the term "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). In turn, the Ohio statute defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev. Code Ann. § 4112.01(A)(13).

While the state and federal statutes are not identical in all respects, courts may "look to regulations and cases interpreting the [ADA] for guidance" when interpreting Ohio law.

*McGlone*, 697 N.E.2d at 206-07; *see Scalia v. Aldi, Inc.*, No. 25436, 2011 WL 6740756, at 7 (Ohio Ct. App. Dec. 21, 2011) (observing that federal decisions on the ADA are relevant to cases under the Ohio statute "when the terms of the federal statute are consistent with Ohio law or when R.C. Chapter 4112 leaves a term undefined"). Generally, analysis of the federal claim will resolve the state claim as well.

Here, Mr. Gearhart alleges two instances of discrimination in violation of the ADA and Ohio law: first, that DuPont failed to accommodate his disability and, second, that he was terminated. The Court will address each in turn.

**1. Failure to Accommodate**

An employer discriminates against an otherwise qualified individual on the basis of a disability when it does not make "reasonable accommodations to the known physical or mental limitations" of the individual unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation" of its business. 42 U.S.C. § 12112(b)(5)(A)

A failure to accommodate claim "unavoidably 'involve[s] direct evidence (the failure to accommodate) of discrimination' because the employer necessarily relied on the worker's disability in making decisions." *Cash v. Siegel–Robert, Inc.*, 548 F. App'x 330, 334 (6th Cir. 2013) (alteration in original) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir.2007)). Accordingly, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), does not apply. *Id.* Rather, in direct evidence cases, the plaintiff must show that he "(1) has a disability, and (2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kempter v. Mich. Bell Tel. Co.,* 534 F. App'x. 487, 490 (6th Cir. 2013) (internal quotation marks omitted).

With regard to the first element, Mr. Gearhart argues that he is not disabled but that he was "perceived" by DuPont to be disabled (Count 3 of the Complaint). DuPont, for its part, "concede[s] that Gearhart was 'disabled' under the ADA and Ohio law during the relevant time." (Def. Mot. Summ. J., ECF No. 26, at 11.) Because it is sufficient to meet this element based on the employer's perception of the employee, this element is met.

Mr. Gearhart argues that the next element is also met because he was otherwise qualified for the position without an accommodation from DuPont. Specifically, although Mr. Gearhart acknowledges that oven work was an essential function of his position, he argues that he was able to perform oven entry after August 23, 2016. (Pl. Resp. to Def. Mot. Summ. J., ECF No. 32, at 4-6). He primarily bases this argument on his disputed version of what he told Dr. Cale and the DuPont nurse about his personal cardiologist, claiming that he did not say that his doctor "is not comfortable with [Gearhart] working in the oven due to his cardiac disease," but that he told Dr. Cale that his doctor had only said that "he doesn't think anybody ought to go into an oven." (*Id.* at 5.) For purposes of DuPont's motion for summary judgment, the Court will accept Mr. Gearhart's version of that conversation as true.

The wordplay notwithstanding, there is no genuine issue of material fact that he was not able to perform the essential functions of his position. First, Dr. Cale was asked several times why he placed the "no oven entry" restriction on Mr. Gearhart, and his testimony is clear that the restriction was based on much more than what Mr. Gearhart told him that his personal cardiologist did or did not say. (*See* Cale Dep. 104-09, 181-82, 189.) Rather, Dr. Cale "was just looking at the whole picture. . . . [M]y decision at that time was based off of reading what had, you know, medically transpired that led up to this, which was . . . hospitalization, transfer to a higher acuity facility, stress test[,] . . . uncontrolled blood pressures, changes in medication and

again, you know, I mean, my number one concern is their safety. I didn't feel that there's a rush to put him back into what I felt could be potentially dangerous." (*Id.* at 108-09.)

Moreover, regardless of exactly what Mr. Gearhart told Dr. Cale that his cardiologist said, the undisputed evidence is that his personal cardiologist came to the same conclusion as Dr. Cale. On August 11, 2016, Dr. Magorien wrote: "[d]ue to the patients [*sic*] cardiac history he should not work in an oven with high temperatures." (*Id.* Ex. 4, at 3.) This evidence is significant not only because it tends to discredit Mr. Gearhart's version of his conversation with Dr. Cale, but because it is evidence that Mr. Gearhart was not qualified for his position without an accommodation. Put another way, Mr. Gearhart cannot create a genuine issue of material fact on this element based on his subjective belief that he could have worked in hot ovens at DuPont when the objective evidence from his own doctor contradicts that belief.

But this does not end the inquiry because he can also survive summary judgment by establishing that he is otherwise qualified for the position with a proposed reasonable accommodation. A plaintiff must establish that he "requested and was denied" a reasonable accommodation. *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002). Plaintiff's burden includes showing both that he proposed an accommodation and that the proposed accommodation was reasonable. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir.2010).

Upon request for reasonable accommodation, plaintiff triggers "an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). In the Sixth Circuit, the informal, interactive process is mandatory. *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir.2008)). Accordingly, "[p]arties should

not obstruct the process, or refuse to participate" in good faith, *Jakubowski*, 627 F.3d at 202, and ought to participate directly with each other, *Kleiber,* 485 F.3d at 871.

If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would have been possible. *Lafata,* 325 F. App'x at 422. On the other hand, when the employer engages with an employee who refuses to participate in good faith or withholds essential information, the employer cannot be liable under the ADA for failure to accommodate. *Wells v. Chrysler Grp., LLC*, No. 3:08CV2264, 2013 WL 2631371, at *6 (N.D.Ohio June 11, 2013); *see also Kleiber v. Honda of Am. Mfg. Inc.*, 420 F. Supp. 2d 809, 828 (S.D.Ohio 2006) ("An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer."), *aff'd*, 485 F.3d 862 (6th Cir.2007). Though the employer need not "propose a counter accommodation in order to participate in the interactive process in good faith[,]" doing so "may be additional evidence of good faith." *Jakubowski*, 627 F.3d at 203. Meeting with the employee, discussing reasonable accommodations, and suggesting other possible positions for the employee satisfies the requirement of good faith participation. *Id.* It behooves an employer to propose a reasonable accommodation—an employee "cannot force [his] employer to provide a specific accommodation if the employer offers another reasonable accommodation." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir.2004)).

If properly respected by employer and employee, the interactive process ought to result in a reasonable accommodation. Reasonable accommodations include "making existing facilities . . . readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification

of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations[.]" 42 U.S.C. § 12111(9). "In determining whether an accommodation is reasonable, the employer must consider (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir.1998) (citing 29 C.F.R. § 1630.9(a), appendix). "[T]he employee is saddled with the burden of proposing an accommodation and proving that it is reasonable." *Jakubowski*, 627 F.3d at 202.

Mr. Gearhart acknowledges that DuPont engaged in an interactive process with him to identify a reasonable accommodation that would have allowed him to keep working. However, he argues that DuPont failed to accommodate him because: (1) it should have brought his cardiologist into the interactive process, (2) it should have accommodated him by allowing him to work in the Tedlar oven, and (3) it should have created a position for him.

As to his first argument, that DuPont should have brought his cardiologist into the process and that Dr. Cale should have "interacted" and had a "dialogue" with Mr. Gearhart's medical providers, (Memo Contra, 6-12), this largely goes back to the issue already addressed above: Mr. Gearhart was not able to perform the essential functions of his job because he could not work in an oven with high temperatures. To the extent that Mr. Gearhart claims that this argument is evidence that DuPont did not participate in the interactive process in good faith, it fails on this issue as well.

As discussed above, a plaintiff must establish that he requested and was denied a reasonable accommodation. There is no evidence that Mr. Gearhart asked that he be permitted to bring his cardiologist with him to the meetings that were scheduled or that he asked anyone at DuPont to talk to his cardiologist. While he claims that Dr. Cale never requested that he bring in his medical information or a clearance from his cardiologist, (*id.*), the burden was on Mr. Gearhart to propose a reasonable accommodation. He certainly had previous experience working with Dr. Cale regarding oven restrictions and, two years previously, had been released to work in the ovens by bringing in a note from his personal doctor. (Cale Dep. 61-69.) During the discussions and interactive process with DuPont, Mr. Gearhart never requested that his personal cardiologist provide him with written clearance to allow him to work in a hot oven. (Gearhart Dep. 118.)

More importantly, the purpose of the interactive process is for the employer and the employee to engage in the dialogue. While the employee's personal doctor may be helpful to the discussion, she is not integral to the process. Mr. Gearhart was aware of and participated in discussions about ways to accommodate his restriction of "no hot ovens." He provides no evidence that including his cardiologist in the discussions about accommodations would have led to a different result. Rather, the only evidence is that Mr. Gearhart's cardiologist would also have restricted him from working in an oven with high temperatures. (Cale Dep. Ex. 4, at 3.) DuPont participated in good faith even without including Mr. Gearhart's cardiologist in the interactive process.

Mr. Gearhart next argues that DuPont should have accommodated him by allowing him to work in the Tedlar oven. While he has not provided any evidence that a position working in the Tedlar oven was available, Mr. Gearhart appears to be arguing that the Tedlar oven was not

14

as hot as the Kapton oven so he should have been permitted to work in the Tedlar oven. (Memo Contra, 8-10, 14-19). This is an accommodation requested by Plaintiff, and it is his burden to demonstrate that the accommodation would have permitted him to do his job.

Mr. Gearhart testified that he requested to work in the Tedlar oven because it is "not similar" to the Kaptor oven, "the temperatures are different, the [protective equipment] is different" and there is "a lot more ventilation." (Gearhart Dep. 165-66.) However, he acknowledged that what he knows of the differences between the two ovens is "just what I hear from the other guys." (*Id.*) He also acknowledged that, based on what he knows, the Tedlar oven does have high temperatures (approximately 105 degrees as opposed to 140 degrees in the Kapton oven), requires the use of protective equipment, and requires a medical clearance to enter. (Gearhart Dep. 162-64.) In fact, even with these differences in the ovens, Dr. Cale testified that the two ovens were similar enough that his medical opinion was that Mr. Gearhart could not work in either. (Cale Dep, 199-200.) Mr. Gearhart's only response is his testimony that he believed he could have worked in the Tedlar oven; he does not provide testimony from his own cardiologist or any other evidence that, because of the differences in the two ovens, Dr. Cale's restriction was unreasonable.

Mr. Gearhart's subjective belief that he could work in the Tedlar oven is insufficient to demonstrate the reasonableness of his proposed accommodation. "An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015)." A medical opinion may even conflict with other medical opinions and still be objectively reasonable. *Id.* (citing *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("A health care professional who disagrees with the prevailing medical

15

consensus may refute it by citing a credible scientific basis" for doing so)). Accordingly, Mr. Gearhart's proposed accommodation is not reasonable because he has not demonstrated that he could have performed the work in the Tedlar oven.

Third, Mr. Gearhart argues that DuPont should have created a position for him, apparently arguing that they should have created a position for him in which his only job function was monomer dumping.[1] (Memo Contra, at 16-18). However, the law is well settled that employers don't have to create *new* positions to accommodate those with disabilities; they only have to consider people fairly for open positions. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1025 (6th Cir. 2013); *Kleiber*, 485 F.3d at 870. Mr. Gearhart has provided no evidence that DuPont had an open position of monomer dumping.

Accordingly, Mr. Gearhart is unable to meet his burden to create a genuine issue of material fact in support of his claims under the ADA or Ohio law for failure to accommodate. DuPont's motion for summary judgment is **GRANTED** on Counts 1 and 4.

### 2. Wrongful termination

When considering discriminatory discharge through circumstantial, as opposed to direct, evidence, the Court applies the three-step burden-shifting framework articulated in *McDonnell Douglas. See Jones v. Potter,* 488 F.3d 397, 403 (6th Cir. 2007). First, plaintiff must establish a *prima facie* case, showing that: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) defendant knew or had reason to know of his disability; and (5) he was replaced, the job remained open, or similarly situated non-protected employees were treated more favorably.

---

[1] In his Memorandum in Opposition to Summary Judgment, Mr. Gearhart says that he "does not challenge" the exclusive position of monomer dumping but he then goes on to argue that "[a]dded staffing as considered by DuPont demonstrates such a consideration is reasonable as a plausible accommodation for Gearhart." (Memo Contra, at 16.) Because "monomer dumping" was the only new position discussed by the parties, the Court considers whether the creation of a monomer dumping position would have been reasonable.

*Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). To meet the third requirement, plaintiff must establish that his disability was a but-for cause of the adverse action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

Once plaintiff establishes a *prima facie* case of discrimination, the burden of persuasion shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." *Jones*, 488 F.3d at 404. If the employer so articulates, plaintiff must then "prove by a preponderance of the evidence that the employer's proffered reason was in fact a pretext designed to mask illegal discrimination." *Id.* If plaintiff's evidence creates a "'genuine dispute at each stage'" of this inquiry, plaintiff defeats summary judgment. *Id.* (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir.2007)).

As above in the discussion regarding reasonable accommodation, the first element of the *prima facie* case is met. There is also no dispute that the third and fourth elements of the *prima facie* case are met. However, Mr. Gearhart's claims fail under the second and fifth elements.

First, as discussed, above, Mr. Gearhart has not established the second element because he was not otherwise qualified for his position, with or without reasonable accommodation. He could not work in a hot oven.

In addition, Mr. Gearhart cannot demonstrate that similarly situated non-protected employees were treated more favorably. Mr. Gearhart points to two other DuPont employees, Kim Clark and John McIlhenny, and argues that DuPont made greater efforts to accommodate those two individuals and assigned them to other positions when they could not work in a hot oven.

In determining whether employees are similarly situated, courts shall consider "whether the individuals have dealt with the same supervisor, have been subject to the same standard[,]

17

and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (internal quotation marks omitted). The role of the Court is to make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998).

Mr. Gearhart provides no evidence that these two employees were similarly situated to him other than to argue that they had "some type of medical condition." (Memo Contra, at 12-13). Instead, he claims that these two other employees are relevant because they demonstrate that DuPont "can conduct an in depth interactive process in an individualized assessment." (*Id.*) But the law is clear that, regardless of whether other employees may have been treated more favorably, to be an appropriate comparator they must be similar to Mr. Gearhart in all relevant aspects.

Mr. Gearhart cannot establish the five elements of a *prima facie* case so there is no need to go further in the three-step burden-shifting framework. DuPont's motion for summary judgment is **GRANTED** on Counts 2, 3, 5, and 6.

### IV. Conclusion

Accordingly, for the reasons set forth above, DuPont's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE